**LEECH TISHMAN ROBINSON BROG, PLLC**
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.: 212-603-6300
Steven B. Eichel
Attorneys for the Debtor and Debtor in Possession

**LEVINE & ASSOCIATES, P.C.**
15 Barclay Road
Scarsdale, New York 10583
Telephone (914) 600-4288
Michael Levine
Special Litigation Counsel for
the Debtor and Debtor in Possession

**UNITED STATED BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**
In re:                                        :        Chapter 11

**SHEM OLAM LLC,**                   :        **Case No. 22-22493-SHL**

                        **Debtor.**        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**

**DEBTOR'S MEMORANDUM OF LAW IN OPPOSITION**
**TO MOTION PURPORTEDLY BROUGHT BY**
**YESHIVA CHOFETZ CHAIM, INC. AND 82 HIGHVIEW LLC**
**TO DISMISS DEBTOR'S CHAPTER 11 CASE**

## TABLE OF CONTENTS

                                                                                    Page

Table of Authorities                                                                iii

Preliminary Statement                                                               1

Statement of facts                                                                  3

    I.  The Formation of the Debtor                             3

    II.  The First Rabbi Mayer Action and the Assignment of the CRDI Debt to CCI   5

    III.  The Acquisition by the Debtor of the Highview Property and the
        Commencement of the Present Adversary Proceeding   7

    IV.  The Property Tax Abatement Application                  13

**ARGUMENT**

THE MOTION TO DISMISS SHOULD BE DENIED
BECAUSE THERE IS INSUFFICIENT EVIDENCE OF BAD FAITH                                 14

    I.  The C-TC factors weigh in favor of denial of the motion    14

    II.  Movants Specific Allegations Are Not a Basis for Dismissal   18

CONCLUSION                                                                          22

# TABLE OF AUTHORITIES

**Page**

## *Judicial Authorities*

*Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.),*
  931 F. F.2d 222 (2d Cir. 1991)                                             15
*Century/ML Cable Venture*, 294 B.R. 9 (Bankr. S.D.N.Y. 2002)               16
*C-TC 9th Avenue P'ship*, 113 F. 3d 1304 (2d Cir. 1997)                     15
*Greater Jamaica Dev. Corp. v. New York City Tax Comm I.*, 25 N.Y.3d 614 (2015)   11
*In re 234-6 West 22nd St. Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997)      15
*In re AAGS Holdings LLC*, 608 B.R. 373 (Bankr. S.D.N. Y. 2019)             15
*In re Cohoes Industrial Terminal, Inc.*, 931 F. 2d 222 (2d Cir. 1991)      16
*In re Encore Prop. Mgmt of W. New York, LLC*, 585 B.R. 22
  (Bankr. W.D.N.Y. 2018)                                                    16
*In re Kingston Square Assocs.*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997)        15
*In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001)                     16
*See In re Walden Ridge Dev., LLC*, 292 B.R. 58 (Bankr. D.N.J. 2003)        17

## *Legislative Authorities*

Bankruptcy Code, §1121                                                     15
New York's Real Property Tax Law, **§** 300                                11
New York's Real Property Tax Law § 420-a                                   10

## *Administrative Authorities*

N.Y. City Dept. of Fin. Letter Ruling No. 074873-021, 2007 N.Y. City Tax LEXIS 17
  (Nov. 21, 2007)                                                          11

## PRELIMINARY STATEMENT

This memorandum of law is submitted by the Debtor, Shem Olam LLC ("Debtor") in opposition to the renewed motion, purportedly brought on behalf of Yeshiva Chofetz Chaim Inc. ("YCC") and 82 Highview LLC ("82 Highview") (YCC and 82 Highview are hereafter referred to as the "Movants"), for an order dismissing the Debtor's Chapter 11 case (the "Chapter 11 Case") in its entirety (the "Motion").

Simply stated, Movants contend that the Chapter 11 case was a "bad faith filing," purportedly because (i) the filing was made "simply to avoid the consequences or continued litigation of a pending state court two-party dispute" and, therefore, constitutes forum shopping [Motion, p. 2]; (ii) the Debtor improperly included a $3.5 million debt on its initial schedules [Motion, pp 2-3], (iii) the Debtor referred to Henoch Zaks ("Henoch") as an "authorized representative" of the Debtor instead of its "manager" [Motion, p. 3] and (iv) the Debtor purportedly failed to include a $11.1 million "promissory note" as an asset on its schedules.

However, the Movants previously filed, on August 3, 2022, their original motion to dismiss this Chapter 11 Case [DE-7, the "Original Dismissal Motion"].  In their Original Dismissal Motion, Movants argued (as they identically do on the instant Motion) that this Chapter 11 Case should be dismissed because (i) it "was an effort to halt the state court action," [p. 2], and (in their supplemental filing, DE-25) that (ii) the Debtor improperly included a $3.5 million debt on its initial schedules [Supplemental Filing, pp 2-3], (iii) the Debtor inaccurately portrayed Henoch's role with the Debtor [Supplemental Filing, p. 3], and (iv) the Debtor purportedly failed to include a $11.1 million "asset" on its schedules.  Indeed, the "argument" section in the Movant's Original Dismissal Motion was *verbatim identical* to the argument section in the present "new" motion,

except that the final paragraph in the "new" Motion makes reference to the $600,000 tax liability alleged against the Debtor by the Town of Ramapo.

On September 20, 2022, the parties appeared before this Court for, *inter alia*, a hearing on the Original Dismissal Motion. This Court indicated on the record that it intended to deny the Motion because the issues raised simply created issues of fact that could not be resolved on the existing record. The Court indicated that it would permit Movants a period of discovery on the allegations in the Original Dismissal Motion to attempt to obtain corroborative evidence supporting the allegations in the Original Dismissal Motion, after which the Movants could re-file the same if (after discovery) they deemed that appropriate. Based thereupon, parties entered into a stipulation on the record agreeing to a discovery schedule regarding the possibly-to-be-refiled Original Dismissal Motion, and the Court issued a Bench Ruling denying without prejudice the Original Dismissal Motion.

On September 28, 2022, this Court issued a written "Order Denying Without Prejudice Motion … to Dismiss Debtor's Chapter 11 Petition and Setting Discovery and Briefing Schedules …" [DE-33]. That Order set forth that "the Dismissal Motion is **DENIED WITHOUT PREJUDICE** to the refiling of the same" (emphasis in original), and set forth a discovery schedule with respect to the "anticipated refiled Dismissal Motion" [p. 2].

On October 10, 2022, before any discovery was conducted by the parties, Movants filed their "new" Motion to Dismiss [DE-38]. While eliminating some of the peripheral factual allegations contained in the Original Dismissal Motion, the "new" Motion still contained the same factual allegations as described above (to wit, that the Chapter 11 filing was an effort to halt the state court action, that the Debtor improperly included a $3.5 million debt on its initial schedules, that Henoch's role with the Debtor was mischaracterized, and that the Debtor purportedly failed to

include a $11.1 million "asset" on its schedules).  No discovery was thereafter conducted by Movants to attempt to corroborate any of their allegations – the same allegations that this Court had previously indicated simply raised issues of fact insufficient (without corroboration during discovery) to support dismissal.

While the lack of the presentation by Movants of the corroborative proof that this Court indicated was necessary (and expected to be ferreted out during discovery) is itself sufficient to require denial of the instant "renewed" Motion, each of the purported "bad faith" instances are (as established below) incorrect, unsubstantiated and/or insufficient to establish a basis for dismissal.

## STATEMENT OF FACTS[1]

### I.    The Formation of the Debtor

In order to fully understand the present motion is context, it is necessary to give the Court a brief overview of the history of the Debtor and, to do so, a brief overview of transactions involving another entity, Mosdos Chofetz Chaim, Inc. ("Mosdos"), which itself was a debtor in a separate Chapter 11 Case before this Court under Case No. 12-23616.  In December of 2005 (prior to its bankruptcy filing), Mosdos had purchased property located at 1-50 Kiryas Radin Drive in Spring Valley, New York (the "Kiryas Radin Property").  In order to purchase and develop the Kiryas Radin Property, Mosdos took a loan from Citizen's Bank, and pledged as security for the same the Kiryas Radin Property (the "Original Mortgage").  The Original Mortgage was thereafter assigned by Citizen's Bank to an entity called Avon Group in September of 2011.  Avon Group, in turn, thereafter assigned the Mortgage to an entity called TBG Radin (the "Assigned Mortgage").

---

[1]  The facts set forth herein are derived from the Complaint and the affirmations submitted in the state court by the parties in connection with a now-removed state court action, as well as in the accompanying Declaration of Henoch Zaks in opposition to the instant Motion.

The Debtor, which was an LLC of which Chofetz Chaim Inc. (a religious corporation) was its sole member, was originally formed by Rabbi Aryeh Zaks ("Rabbi Aryeh") and Henoch Zaks ("Henoch") for the purpose of acquiring the Assigned Mortgage and underlying promissory note from TBG Radin.  The Debtor acquired the Assigned Mortgage and Note by written agreement in or around September of 2019.  As of that time, the Assigned Mortgage was in the amount of approximately $23,700,000.00.

In October of 2019, pursuant to its approved plan of reorganization, Mosdos was required to sell the Kiryas Radin Property in order to pay off the Assigned Mortgage.  An entity called Congregation Radin Development Inc. ("CRDI"), a religious corporation whose rabbi was Rabbi Aryeh, purchased the Kiryas Radin Property from Mosdos for a purchase price of $25,700,000.

That purchase price (together with additional closing costs) was partially financed via a $15,000,000.00 mortgage loan that CRDI took from Sterling Bank.  CRDI, however, could obtain no larger commercial financing but could obtain a temporary loan from one of its contributors, provided that the same could be repaid shortly after the closing.  CRDI requested that Shem Olam lend back to it $11.1 million of the Amended Mortgage payoff after the closing by way of a payment directly to the contributor.  However, pursuant to CRDI's mortgage agreement with Sterling Bank, CRDI could not grant the Debtor any mortgage on the Property, so the loan from the Debtor would be essentially unsecured.  Henoch agreed to the same, a Promissory Note was prepared (but never signed), and the Debtor paid the funds directly to CRDI's contributor.  CRDI, thus, became indebted to the Debtor in the amount of $11,100,000.00 as of October of 2019.  As indicated, no promissory note was ever executed to reflect that indebtedness.

## II.        The First Rabbi Mayer Action and the Assignment of the CRDI Debt to CCI

On October 25, 2019, CRDI entered into a lease agreement with Chofetz Chaim Inc. ("CCI"),
the sole member of Shem Olam, for CCI's lease of the Yeshiva Building located on the Kiryas
Radin Property for a period of three years.  A copy of the said lease is annexed hereto and labeled
Exhibit "1".  As can be seen therefrom, the lease required YCC to use the Yeshiva Building
exclusively as a Yeshiva and community center at a rent of Seventeen Thousand Dollars per month.
However, notwithstanding that CRDI had purchased the Kiryas Radin Property and owned the
same outright as of October of 2019, and notwithstanding that CCI was the sole occupant of the
Yeshiva Building thereon, Rabbi Mayer refused to vacate the Yeshiva Building or the Kiryas
Radin Property.  Subsequent attempts to resolve the issues among themselves (with the assistance
of various local rabbis) proved unsuccessful.

On December 5, 2019, Rabbi Mayer brought an "emergency" motion to this Court (Judge
Drain) seeking to hold Rabi Aryeh in "contempt" for the "fraudulent" transfer of the Kiryas Radin
Property to CRDI and to enjoin him from taking any action with the respect to the Kiryas Radin
Property.  Subsequently, on January 15, 2020, Rabbi Mayer, purportedly derivatively on behalf of
Mosdos, filed an amended complaint in a State Court action that he had commenced the prior year
against the Debtor and TBG Radin (seeking to set aside the assignment of the Assigned Mortgage
from TBG Radin to the Debtor), which amended complaint sought, *inter alia*, to set aside the
conveyance of the Kiryas Radin Property from Mosdos to CRDI and declare Mosdos to be the free
and clear owner of the same.  Rabbi Mayer claimed, *inter alia*, that he and his designees were the
actual trustees of Mosdos and that they had not approved the sale.  All the while, Rabbi Mayer and
his family continued to occupy the Kiryas Radin Property, including the Yeshiva that had been

leased exclusively to CCI.  CCI and CRDI removed that state court action to the District Court, which then referred the same to this Court.

Although Judge Drain ultimately denied the "contempt" motion, he set down the claims in that motion and the removed state court action for a trial.  Although CCI and CRDI sought to use the Kiryas Radin Property for their purposes (in the case of CCI, that was to conduct services and classes in the Yeshiva) since CRDI's acquisition of the same, Rabbi Mayer's refusal to vacate the Kiryas Radin Property and, particularly, the Yeshiva, made it impossible for CCI to peaceably conduct prayer services and classes.  Indeed, several public confrontations took place as a result of the "dual" occupancy of the Yeshiva by CCI and Rabbi Mayer and his group.

On March 26, 2020, Judge Dain issued an Order delineating the disputed subject matters for the trial of the removed state court action (which included whether Rabbi Mayer's claim that his people were the trustees and in control of Mosdos, or Rabbi Aryeh's contrary claim, was the accurate one) and also issued a "standstill order" which prevented CRDI and CCI from taking any action to remove Rabbi Mayer and his family from the CRDI Property or the Yeshiva.  As a result, and given the discovery schedule and other pretrial matters, it appeared that the standstill order would remain in place for quite some time.  Consequently, and given that CCI could not reasonably conduct its services, or provide a stable study atmosphere for its students, CCI began, in around early April of 2020, to look for an alternative location where it could do that.

One property which was adjacent to the Kiryas Radin Property, and had a single-family house located on it, was potentially a good fit, but CCI would have to purchase the property (it was not then being offered for sale), tear down the existing house, and build a Yeshiva and potentially student housing units thereon.  CCI commenced discussions with that adjacent property owner (who indicated a willingness to entertain discussions for a sale for approximately $1.75 to $2

million).  However, CCI which, at the time, had as its sole asset only the lease to the Kiryas Radin

Property, would have to obtain financing in order to acquire and develop the adjacent property.

When CCI started to investigate potential financing in around late May, early June of 2020, it

discovered that no commercial lender was willing to lend the funds necessary to finance that

project unless CCI had assets sufficient to support such a loan, which it did not.  The Debtor,

however, who owned the $11 million then-existing debt from CRDI, was in a position to assist its

parent, CCI.  To accomplish that, the Debtor could not simply "loan" CCI the CRDI debt (because

a loan does not reflect as an "asset" on a balance sheet).  Instead, on or about June 8, 2020, the

Debtor donated the CRDI debt to CCI outright, and so advised CRDI.  While it was simply a book

transfer, CCI owned the CRDI debt as of that date and the Debtor had no further rights to collect

the same.[2]

### III.    The Acquisition by the Debtor of the Highview Property and the Commencement of the Present Adversary Proceeding

Purported Movant YCC is a religious corporation of which Rabbi Aryeh is its President and

Rabbi.  YCC formerly owned the real property located at 82 Highview Road in Suffern, New York

(the "Highview Property").  In 2007, the mortgagee on the Highview Property, TD Bank, N.A.

("TD Bank"), commenced an action against YCC seeking to foreclose TD Bank's mortgage on

the Highview Property, which was then in default.  In that foreclosure action, TD Bank was

---

[2]  CCI was not able to reach an agreement with the adjacent property owner to complete that transaction and was looking for other properties.  Ultimately, the issue of the ownership of the Kiryas Radin Property was tried on March 4, 2021 – one year after the standstill order was issued – and the Court (Judge Drain) ruled in favor of CRDI and CCI.  That ruling was memorialized in a written Order on April 2, 2021.  A copy of the same is annexed hereto and labeled Exhibit "2".  As can be seen, the same determined that Rabbi Aryeh's identification of the actual trustees of Mosdos was correct, and Rabbi Mayer's false.  Thus, the Court determined that the conveyance of the Kiryas Radin Property to CRDI would stand.

eventually awarded a judgment of foreclosure, and a foreclosure sale took place on August 20, 2013, in which TD Bank purchased the Highview Property.  A copy of the recorded Referees' Deed conveying the Highview Property to TD Bank is annexed hereto and labeled Exhibit "3".

Four years later, on September 18, 2017, TD Bank sold the Highview Property to an entity known as Del Realty, LLC ("Del Realty") for $1,400,000.00.  A copy of the recorded deed by which Del Realty acquired the Property is annexed hereto and labeled Exhibit "4".

Because substantial disputes had arisen between Rabbi Mayer Zaks ("Rabbi Mayer") and Rabbi Aryeh at that point related to the operations of Mosdos, Rabbi Aryeh and Henoch Zaks ("Henoch") (his son) decided that they would attempt to acquire the Highview Property from Del Realty so that Rabbi Aryeh could, if he wished, either use the site for YCC or form his own congregation in the future independent of Rabbi Mayer and use the Property as the site of Rabbi Aryeh's yeshiva and (ultimately) student housing units.

Rabbi Aryeh and Henoch formed 82 Highview on October 16, 2018, with the intention of negotiating to acquire the Highview Property in the name of that entity as soon thereafter as possible.  Henoch ultimately arranged for the acquisition of the Highview Property by 82 Highview.  In order to leave all options open (potential development, resale of the property, etc.), they did not form 82 Highview as a religious corporation, but rather it was formed under § 203 of the New York Limited Liability Company Law.  That gave Rabbi Aryeh and Henoch the greatest flexibility for the future use and/or disposition of the Highview Property with the least potential restrictions.  A copy of the filing receipt and articles of organization for 82 Highview are annexed hereto and labeled Exhibit "5".  A copy of a printout from the New York Secretary of State confirming the formation date and status of 82 Highview is annexed thereto and labeled Exhibit "6".

8

At the time of the formation of 82 Highview, Rabbi Aryeh was the sole forming/founding member/manager of that entity. A copy of the operating agreement of 82 Highview is annexed hereto and labeled Exhibit "7".[3] In that operating agreement, Rabbi Aryeh designated YCC as the limited-duration member of 82 Highview "for the first thirty months of the LLC." That meant that YCC would be the sole member of 82 Highview LLC from October 16, 2018, through April 16, 2021, unless thereafter further extended by Rabbi Aryeh. The Operating Agreement further provided that:

> Automatically upon the completion of said thirty-month term, all rights title (sic) and membership interests in the LLC shall belong to the Forming Member Manger or if so designated by the Forming member manager, to anyone else he so designates.

---

[3] As Rabbi Mayer Zaks neither founded 82 Highview nor was on the Board of Trustees of YCC at the time of the transfer of 82 Highview to Rabbi Aryeh Zaks, there was no need for Rabbi Mayer Zaks to either see the 82 Highview Operating Agreement or authorize it. Moreover, although Rabbi Mayer now contends that the Operating Agreement was "bogus," he has not presented what he claims to be the *actual* operating agreement of 82 Highview (contending, instead, that there never was *any* operating agreement of 82 Highview at any time). However, Section 417 of New York's Limited Liability Company Law requires (at sub-section a), that "the members of a limited liability company **shall** adopt a written operating agreement that contains any provisions not inconsistent with law or its articles of organization relating to (i) the business of the limited liability company, (ii) the conduct of its affairs and (iii) the rights, powers, preferences, limitations or responsibilities of its members, managers, employees or agents, as the case may be" (emphasis added). Section 417 further provides that "an operating agreement may be entered into before, at the time of or within ninety days after the filing of the articles of organization." In the case of 82 Highview, that entity was formed on October 16, 2018, and the Operating Agreement was executed six days later, on October 22, 2018. If, as Rabbi Mayer now contends, he was in control of YCC (and YCC was in control of 82 Highview at that time), why hasn't he produced the mandatory §417 operating agreement that he claims was controlling? Indeed, the only way that YCC could have possibly obtained *any* interest in 82 Highview was through such an operating agreement. If, as Rabbi Mayer now contends, the operating agreement of 82 Highview was "bogus," then YCC could not have *possibly* obtained (and therefore did not obtain) any interest in 82 Highview.

[4] Even were it not that Rabbi Aryeh became the sole member of 82 Highview LLC at that point, the Operating Agreement still gave him the exclusive right to manage the LLC. Section II(3) of the Operating Agreement provided that "[t]his LLC shall be managed exclusively by its forming member manager."

Upon the completion of the Thirty-month period above the percentage interest in the LLC that each member shall have is as follows:

| NAME & ADDRESS | CONTRIBUTION | %INTEREST IN LLC |
|---|---|---|
| (1)    **Rabbi Aryeh Zaks** | NA | 100% |

The Highview Property was ultimately conveyed from Del Realty to 82 Highview on October 23, 2018, the week following Rabbi Aryeh's formation of 82 Highview. A copy of the recorded deed reflecting that transfer is annexed hereto and labeled Exhibit "8". Pursuant to the 82 Highview Operating Agreement, YCC remained the sole member of 82 Highview from October 16, 2018, until its term expired on April 17, 2021 (thirty months after the formation of 82 Highview), whereupon Rabbi Aryeh (having not extended YCC's membership) became the sole member of 82 Highview. Thus, as of April 17, 2021, the Property owned by 82 Highview was now controlled by Rabbi Aryeh Zaks rather than YCC, as the right, title and membership interest in 82 Highview LLC was transferred to Rabbi Aryeh Zaks under the 82 Highview Operating Agreement.

On June 29, 2021 – more than *two months after* he became the sole member and manager of 82 Highview – Rabbi Aryeh Zaks caused the Highview Property to be transferred to the Debtor.[4] A copy of the deed (recorded June 20, 2021) conveying the Highview Property from 82 Highview to the Debtor is annexed hereto and labeled Exhibit "9".

The reason for the transfer (aside from Rabbi Aryeh's desire to disassociate himself from Rabbi Mayer) finds its genesis in the tax laws of the State of New York. Section 300 of New

---

[4] Even were it not that Rabbi Aryeh became the sole member of 82 Highview LLC at that point, the Operating Agreement still gave him the exclusive right to manage the LLC. Section II(3) of the Operating Agreement provided that "[t]his LLC shall be managed exclusively by its forming member manager."

York's Real Property Tax Law ("RPTL") provides that "[a]ll real property within the state shall be subject to real property taxation … unless exempt therefrom by law".  RPTL § 420-a (1) provides that a non-profit corporation is entitled to an exemption if it owns real property and demonstrates that it is "conducted exclusively for religious, charitable, hospital, educational, or moral or mental improvement of men, women or children purposes, [and that] the property is used exclusively for carrying out thereupon one or more of such purposes."  To establish entitlement to a real property tax exemption pursuant to RPTL §420-a where the property owner is an LLC (i.e., *not* a not-for-profit or religious entity), the property owner must establish, *inter alia*, that the LLC's sole member qualifies for a §420-a exemption (i.e., that it is a not-for-profit or religious corporation).  *See*, e.g., *Greater Jamaica Dev. Corp. v. New York City Tax Comm I.*, 25 N.Y.3d 614, 632 fn.1 (2015) (citing N.Y. City Dept. of Fin. Letter Ruling No. 074873-021, 2007 N.Y. City Tax LEXIS 17 [Nov. 21, 2007]).

Since 82 Highview was an LLC (i.e., neither a nonprofit nor a religious organization), the only manner in which the Highview Property could have maintained its tax-exempt status once YCC was no longer its sole member was if either its new sole member was a nonprofit or tax-exempt entity.  Obviously, Rabbi Aryeh, as the sole member of 82 Highview as of that time, did not fall into that category.  So, Henoch and Rabbi Aryeh had one of two choices in order to maintain the property tax exemption on the Highview Property – either Rabbi Aryeh could transfer his membership in 82 Highview outright to a religious corporation, or 82 Highview could transfer the Highview Property to another entity which had, as its sole member, a religious entity.

Rabbi Aryeh decided to convey the property to the Debtor, primarily because the Debtor's sole member (Chofetz Chaim, Inc.) was a religious entity which would (insofar as they thought at

the time) permit the Highview Property to retain its property tax exempt status.[5] Rabbi Aryeh and Henoch would also have a say in the management of the Debtor because Chofetz Chaim Inc. (its sole member) was controlled by its Board of Trustees which was comprised of Rabbi Aryeh, Henoch, and other members of their family.

On December 23, 2021 – almost *eight months* after YCC was no longer a member of 82 Highview, and almost *six months* after the acquisition of the Highview Property by the Debtor, Rabbi Mayer (purportedly on behalf of YCC and 82 Highview) commenced yet another action in the New York State Court, Rockland County, under Index No. 36879/2021 (the "State Court Action") seeking to set aside the conveyance of the Highview Property from 82 Highview to the Debtor.

On the date that that action was filed, however, the Debtor believed that it had only one creditor, one of its prior attorneys, who was owed slightly more than $100,000.00, who was not pressing for quick payment and (if push came to shove, the Debtor could borrow the funds necessary to pay him from a private lender). Thus, there was no immediate necessity for any Bankruptcy Court intervention, and the Debtor was not even thinking in those terms. Instead, the Debtor retained counsel who, on February 15, 2022, moved to dismiss the complaint on the ground of the existence of documentary evidence (Shem Olam's Operating Agreement) which was believed to constitute a complete defense to the action. On April 15, 2022, Rabbi Mayer moved for a temporary restraining order and preliminary injunction prohibiting the Debtor from selling

---

[5] Although not relevant to the instant motion, there were other important prevailing business and financial considerations which also mitigated in favor of the Debtor acquiring the Highview Property. While too detailed and complex to discuss in depth here, one example of the same was the payment by the Debtor, from the proceeds it received for the satisfaction of the Assigned Mortgage, to various creditors of YCC.

the Highview Property or commencing any eviction proceedings with respect thereto.  On the same day, April 15, 2022, Judge Berliner denied Rabbi Mayer's request for a temporary restraining order.

Although the motion to dismiss was made on February 15, 2022, and the order to show cause seeking a preliminary injunction was filed on April 15, 2022, the state court judge (Judge Berliner) did not issue a decision until July 12, 2022, some three months later.  In that decision, Judge Berliner denied the motion to dismiss, ruling that issues of fact precluded the same at that point, and did not issue any preliminary injunctive relief.

### IV.    The Property Tax Abatement Application

In the meantime, on February 23, 2022, the Debtor filed a request for a property tax exemption that the Highview Property had been granted the prior year.  Henoch Zaks filed the same as the property manager of the Highview Property.[6]  A copy of the same is annexed hereto and labeled Exhibit "10".

On April 29, 2022, the Town of Ramapo tax department sent the Debtor a letter denying the application for property tax exemption for 2022.  A copy of the same is annexed hereto and labeled Exhibit "11".  Also on April 29, 2022, the Town of Ramapo notified the Debtor that the prior 2021 exemption was being retroactively reversed as well.  A copy of that notice is annexed hereto and labeled Exhibit "12".  Thus, in the blink of an eye, the Debtor went from having a single creditor (its lawyer) to a claimed obligation of nearly $600,000.00.

The Debtor sought review of the same from the Town of Ramapo Assessment Board of Review, which, on June 29, 2022, refused to reverse the determination.   A copy of that

---

[6]  The designation on the application was that he was the "manager," however he intended that to mean that he was the property manager for the Highview Property.

determination is annexed hereto and labeled Exhibit "13".  On July 27, 2022, the Debtor filed a

petition in the state court for certiorari, challenging the determinations of the Town of Ramapo

Tax Department, under Index number 33289/2022.   However, If the town of Ramapo was

successful in opposing that petition, a large monetary judgment would have been entered against

the Debtor and the Debtor would have had absolutely no means by which it could pay the same,

because, in the short term, notices of pendency had been filed against the Highview Property by

Rabbi Mayer, and, in the long term, it faced being divested of its sole asset, the Highview Property.

If the attack on the Highview Property did not exist, the Debtor could have either financed the

same to pay any tax and attorney's fee obligations or sold the same to accomplish that purpose.

Thus, the fate of the Highview Property was directly linked to the Debtor's ability to pay its

creditors.

Moreover, aside from the former attorney to whom the Debtor then owed money, it had

also accumulated additional legal fees for its counsel's efforts in the state court action that Rabbi

Mayer had commenced seeking to set aside the Highview Property transfer.

Based upon all of that, the Debtor's Chapter 11 Petition was filed on July 27, 2022, the

same day its tax certiorari petition was filed in the state court.

## ARGUMENT

### THE MOTION TO DISMISS SHOULD BE DENIED
### BECAUSE THERE IS INSUFFICIENT EVIDENCE OF BAD FAITH

### I.  *The C-TC factors weigh in favor of denial of the motion*

Movants seek to dismiss this bankruptcy case pursuant to section 1112(b) of the

Bankruptcy Code, based upon unsupported "bad faith" allegations.   However, unsupported

"bad faith" allegations are routinely made in cases where the Debtor is a holding company

formed prior to the petition date for the sole purposes of acquiring or developing real property. This Court has recognized "the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997).

Section 1121(b)(1) of the Bankruptcy Code provides that a case may be dismissed "for cause." A case that was filed in bad faith can constitute cause for dismissal under section 1112(b)(1). *In re AAGS Holdings LLC*, 608 B.R. 373, 382 (Bankr. S.D.N. Y. 2019). "A petition is filed in bad faith 'if it is clear that on the filing date there was no reasonable probability that it would eventually emerge from bankruptcy proceedings.'" *Id.* citing *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.),* 931 F. F.2d 222, 227 (2d Cir. 1991); *accord In re Kingston Square Assocs.,* 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) ["The standard in this Circuit is that a bankruptcy petition will be dismissed if both objective futility of the reorganization process *and* subjective bad faith in filing the petition are found." (emphasis added)]

In *C-TC 9th Avenue P'ship*, 113 F. 3d 1304 (2d Cir. 1997), the Second Circuit established the following criteria as indicia of a debtor's bad faith filing:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*C-TC*, 113 F.3d at 1311. However, the inference of "bad faith" is not established through the rote recitation of the *C-TC* factors. *See In re AAGS Holdings, LLC*, 608 B.R. at 383 [courts caution not to apply such factors mechanically]. Courts applying the *C-TC* criteria engage in a detailed factual analysis to determine if the Debtor's filing constitutes an abuse of judicial process. *See In re Encore Prop. Mgmt of W. New York, LLC*, 585 B.R. 22, 30 (Bankr. W.D.N.Y. 2018) ["In determining whether good faith is absent (and bad faith is present), the court must consider the totality of the circumstances – not one single factor."].

For example, in *Century/ML Cable Venture*, the bankruptcy court found that even where some factors may weigh in favor of dismissal, "the Court does not engage in a mechanical counting exercise, the Court believes that the …. filing does not warrant dismissal for cause, as an overview of the … situation suggests that chapter 11 relief is warranted." 294 B.R. 9, 35 (Bankr. S.D.N.Y. 2002). In *In re Sletteland*, when a shareholder group sought to dismiss, as a bad faith filing, an individual debtor's chapter 11 petitioner after losing a derivative action, the Court noted: "[I]n reality, there is a 'considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose.'" 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) (*citing In re Cohoes Industrial Terminal, Inc.*, 931 F. 2d 222 [2d Cir. 1991]).

In this case, an examination of the *C-TC* factors shows that they weigh heavily against dismissal of this case, despite Movants' misinterpretation of the *C-TC* factors as they apply to the Debtor's chapter 11 case. First, factors (1), (6), and (8)[7] (single asset debtor, little cash flow and no employees) should not be mechanically applied here, as the Debtor is a holding company

---

[7] Factor (7) is not applicable here. There is no evidence that the Debtor is failing to pay its current expenses as the Debtor is contesting its liability for real property taxes.

formed for the specific purpose of acquiring a mortgage and thereafter real holding the Property. Use of a holding company is routine in sophisticated real estate transactions. Holding companies will only have one asset and no employees as they engage in no other business, other than to act as owner of the property. But the Bankruptcy Code does not statutorily preclude such entities from filing for chapter 11 relief. *Id.* Indeed, the Movants' argument would require dismissal whenever any holding company sought chapter 11 protection. This allegation is merely a distraction.

With respect to Factor 3, the Debtor is not subject to a foreclosure action as a result of arrearages or default on any debt, but is subject to two separate litigations – one with the Movants and the other with the Town of Ramapo. The action with the Movants, which has been removed to this Court, is the subject to the Motion and the Motion to Remand. The second action is the appeal of the Debtor's real estate tax assessment, which was removed to this Court and remanded back to Rockland Supreme Court based on a stipulation between the parties. For the same reasons, factor 4 does not apply, as this case is *not* a two-party dispute; indeed, its resolution will determine (i) whether at least three creditors' claims, aggregating in the hundreds of thousands of dollars, will be paid, and (ii) whether the Debtor will be in a position to reorganize so as to obtain financing and/or sell its property in order to pay its creditors.

With respect to factor 2, the Debtor has filed its amended schedules of creditors, which shows creditors with claims totaling over $800,000. *See In re Walden Ridge Dev., LLC*, 292 B.R. 58, 64 (Bankr. D.N.J. 2003) [court found 13 creditors with general unsecured claims totaling $351,700 to be sufficient]. Moreover, claims of the unsecured creditors are slightly more than one third of the amount of the Town of Ramapo scheduled disputed secured claim

in this case.  As to factor 5, the timing of the filing does not evidence any intent to delay and frustrate Movants' "legitimate" efforts to enforce its rights.  The purpose of the bankruptcy filing was to preserve the Debtor's rights, and either sell the Property or refinance it to pay the Debtor's obligations.

Moreover, there is no objective futility in the reorganization process as the Debtor is seeking to move its case along as expeditiously as possible as evidenced by (i) its willingness to file a plan which calls for the sale of the Property with the proceeds to go to the ultimate owner of the Property after payment of claims against the Debtor's estate, and (ii) the fact that the Debtor has removed the State Court Action so it can be resolved quickly and permit the Debtor to promptly pay its creditors.  Moreover, this is not a case where there was an interest to delay or frustrate the legitimate efforts of the Debtors' secured creditors to enforce their rights.  Here, the Movants are *not* secured creditors, and are actually improperly occupying the debtor's Property without paying any rent to the Debtor either prepetition or post-petition.  As the Movants have continued to use the Property during this time, there is no harm to them.  Accordingly, based on an analysis of the *C-TC* factors, it is clear that the case was not filed in bad faith and is not objectively futile.

## II.    *Movants Specific Allegations Are Not a Basis for Dismissal*

Movants make several allegations, none of which are a basis to dismiss the Debtor's bankruptcy case.  They first assert that the Debtor filed misleading schedules because it did not disclose an $11.1 loan from the Debtor to CRDI, whether the loan was repaid, and what happened to the proceeds of that loan repayment.  [Motion, p. 6-7].  However, as is clear from the accompanying Declaration of Henoch, the $11.1 million loan was never reduced to a signed promissory note and, in any event, was not listed as an asset of the Debtor because the same

was donated to another charitable entity more than two years before the filing of the Chapter 11 Petition.

Movant's second allegation is that 645 Springdale Holdings was improperly listed as aa creditor of the Debtor and the obligation was manufactured as a basis to avoid dismissal of the bankruptcy case. [Motion at 7-9]. First, the Debtor did *not* "manufacture" any claim. In fact, 645 Springdale has a $3.5 million judgment against YCC, which judgment was filed at a date when YCC was the sole member of 82 Highview and 82 Highview owned the Highview Property. The Debtor believed that the judgment therefore was secured against the Highview Property and became a secured claim against the Debtor when it acquired the Highview Property. However, when special litigation counsel examined the situation, it became clear that the Debtor's misunderstanding as to the law applicable to that situation (i.e., that the judgment transferred with the Property to the purchaser of the same) was erroneous. When confronted with that, the Debtor amended its schedules to remove that claim.

Movants also contend that the Debtor misrepresented its affiliated and familial relationship with 645 Springdale Holdings. [Motion at 9-10]. However, contrary to the Movants' allegations, the Debtor did *not* make any misrepresentation regarding 645 Springdale Holdings. At the 341 meeting, the Debtor testified that none of his family members are employed by 645 Springdale Holdings and the Debtor stands by that testimony. Movants, who had an opportunity to conduct discovery to attempt to contradict that and have declined to do so.[8]

---

[8] The Movants' allegation stems from a release of a judgment held by 645 Springdale Holdings against Rabbi Aryeh Zaks, which release was signed by Rabbi Aryeh Zaks' wife Beatrice Waldman. In the text of the release, it indicated that it was being signed by a "proper corporate officer" of 645 Springdale Holdings; however, (i) the release was prepared by the title company,

Next, the Movants assert that the Debtor was not honest about its corporate governance, referring to a real estate tax exemption application for the Debtor signed by Henoch as "manger," and he is now alleged to have a different relationship with the Debtor. However, as is clear from Henoch's accompanying Declaration, he believed he was signing as the manager the Highview Property, not as "manager" of Shem Olam.[9]  Indeed, the concept of a "manager" as an officer of a corporation simply does not exist under New York law. Consistent with the Shem Olam operating agreement, Rabbi Aryeh Zaks is the sole person in charge of the management of the Debtor, and he appointed Henoch to be an authorized representative of the Debtor.

Finally, Movants contend that Rabbi Aryeh has allegedly previously abused the bankruptcy process and filed a bad faith bankruptcy petition twenty years ago in *In re Stern*, 268 B.R. 390 (Bankr. SDNY 2001).  In that case, YCC and others were found to have filed an involuntary

---

(ii) the term "proper corporate officer" was not listed below Beatrice Waldman's name when she signed it, and (iii) the title company did not know that Beatrice Waldman was not employed by 645 Springdale Holdings.  In their Motion, Movants allege that further discovery is required regarding 645 Springdale Holdings in that regard, and to ascertain why the matter was placed on the Debtor's schedules to begin with.  But this Court gave the Movants ample time to conduct such discovery and they voluntarily squandered the same.  The removal of the claim renders any issue regarding it moot and is nothing but a red herring at this point.  Certainly, the Movants have not presented anything close to establishing that the chapter 11 filing was in bad faith because this now removed claim was listed.

Similarly, Movants assertion that, independent of the scheduling of the claim, there was allegedly "false" testimony given by Henoch during the 341 exam of the Debtor, is also a red herring.  First, that testimony has nothing to do with the filing of the chapter 11 petition.  Secondly, during that examination, Henoch was asked about any "affiliation" with 545 Springdale Holdings.  He asked Mr. Wilson, counsel for the Movants, to clarify what the word "affiliated" meant in the context of his question, and Henoch answered appropriately based on Mr. Wilson's clarification.

[9] Similarly, Henoch Zaks has signed applications for CRDI's tax exemption as manager of the property that it owns as well.

petition in bad faith.  While it is understandable that Movants wish to divert attention from the fact that their "substantive" argument in this case is doomed to failure, how they can assert in good faith that a twenty-year old situation having no factual relationship to the instant case is relevant here is mystifying.[10]

In short, there is nothing before the Court that even comes close to requiring a bad faith dismissal by this Court.

---

[10]  Indeed, if one wished to get into a discussion of prior bad acts, one would have to address the prior acts of Rabbi Mayer, including (i) Judge Drain's prior finding that Rabbi Mayer caused one of his sons to *twice* break into Rabbi Aryeh's office and steal files and steal digital and hard-cop files ["I find and conclude that Tzvi Zaks destroyed relevant and supportive evidence intentionally and in bad faith … to destroy evidence pertaining to the dispute between his father, Rabbi Mayer Zaks, and his uncle, Rabbi Aryeh Zaks … Further, I find and conclude that Tzvi Zaks acted as an agent of his father, in which case his conduct can be attributed to Rabbi Mayer Zaks."]; (ii) Rabbi Mayer's causing another of his son's, Shimon Zaks, to illegally wiretap telephone conversations between Rabbi Mayer, Henoch and their then attorney [Shimon Zaks asserted his Fifth Amendment right and refused to answer questions regarding that 135 times during his deposition in that case]; and (iii) the multiple orders holding Rabbi Mayer is contempt for his *repeated* violation of Court Orders.

## CONCLUSION

For the reasons set forth above, and in the accompanying Declaration of Henoch Zaks,

the movants' motion for dismissal of the within chapter 11 case should be denied in all respects.

Dated: December 5, 2022

**LEECH TISHMAN ROBINSON BROG, PLLC**

**By:**  s/ *Steven B. Eichel*  
      **Steven B. Eichel**  
875 Third Avenue, 9th Floor  
New York, New York 10022  
Tel. No.: 212-603-6300  
*Attorneys for the Debtor and Debtor in Possession*

**LEVINE & ASSOCIATES, P.C.**

**By:**  s/ *Michael Levine*  
      **Michael Levine**  
15 Barclay Road  
Scarsdale, New York 10583  
Telephone (914) 600-4288  
Michael Levine  
*Special Litigation Counsel for*  
*the Debtor and Debtor in Possession*