**LEECH TISHMAN ROBINSON BROG, PLLC**
875 Third Avenue, 9th Floor
New York, New York 10022
Tel. No.: 212-603-6300
Steven B. Eichel
Attorneys for the Debtor and Debtor in Possession

**LEVINE & ASSOCIATES, P.C.**
15 Barclay Road
Scarsdale, New York 10583
Telephone (914) 600-4288
Michael Levine
Special Litigation Counsel for
the Debtor and Debtor in Possession

**UNITED STATED BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | | |
| **SHEM OLAM LLC,** | : | Case No. 22-22493-SHL |
| | | |
| Debtor. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### DECLARATION OF HENOCH ZAKS IN OPPOSITION
### TO THE MOTION PURPORTEDLY BROUGHT BY
### YESHIVA CHOFETZ CHAIM, INC. AND 82 HIGHVIEW LLC
### TO DISMISS DEBTOR'S CHAPTER 11 CASE

I, Henoch Zaks, hereby affirm under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1. I am a Member of the Board of Trustees of Chofetz Chaim Inc. ("CCI"), which is the sole member of Shem Olam LLC ("Shem Olam" or "Debtor"), and am authorized by My father Rabbi Aryeh Zaks, the Debtor's Manager, to act on behalf of the Debtor. I submit this Declaration in support of Debtor's Opposition to (I) Motion by Yeshiva Chofetz Chaim, Inc. and 82 Highview LLC to Dismiss Debtor's Chapter 11 Case.

### I.  The Formation of the Debtor

2. In order to fully understand the present motion in context, it is necessary to give to the Court a brief overview of the history of the Debtor and, to do so, a brief overview of transactions involving another entity, Mosdos Chofetz Chaim, Inc. ("Mosdos"), which itself was a debtor in a separate Chapter 11 Case before this Court under Case No. 12-23616. In December of 2005 (prior to its bankruptcy filing), Mosdos had purchased property located at 1-50 Kiryas Radin Drive in Spring Valley, New York (the "Kiryas Radin Property"). In order to purchase and develop the Kiryas Radin Property, Mosdos took a loan from Citizen's Bank, and pledged as security for the same the Kiryas Radin Property (the "Original Mortgage"). The Original Mortgage was thereafter assigned by Citizen's Bank to an entity called Avon Group in September of 2011. Avon Group, in turn, thereafter assigned the Mortgage to an entity called TBG Radin (the "Assigned Mortgage").

3. The Debtor, which was an LLC of which Chofetz Chaim Inc. (a religious corporation) was its sole member, was originally formed by my father, Rabbi Aryeh Zaks ("Rabbi Aryeh" or "my father"), and me for the purpose of acquiring the Assigned Mortgage and underlying promissory note from TBG Radin. The Debtor acquired the Assigned Mortgage and Note by written agreement in or around September of 2019. As of that time, the Assigned Mortgage was in the amount of approximately $23,700,000.00.

4. In October of 2019, pursuant to its approved plan of reorganization, Mosdos was authorized to sell the Kiryas Radin Property in order to pay off the Assigned Mortgage. An entity called Congregation Radin Development Inc. ("CRDI"), a religious corporation whose rabbi was my father, purchased the Kiryas Radin Property from Mosdos for a purchase price of $25,700,000.

2

5. That purchase price (together with additional closing costs) was partially financed via a $15,000,000.00 mortgage loan that CRDI took from Sterling Bank. CRDI, however, could obtain no larger commercial financing but could obtain a temporary loan from one of its contributors, provided that the same could be repaid shortly after the closing. CRDI requested that Shem Olam lend back to it $11.1 million of the Amended Mortgage payoff after the closing by way of a payment directly to the contributor. However, pursuant to CRDI's mortgage agreement with Sterling Bank, CRDI could not grant the Debtor any mortgage on the Property, so the loan from the Debtor would be essentially unsecured. I agreed to the same, a Promissory Note was prepared (but never signed), and the Debtor paid the funds directly to CRDI's contributor. CRDI, thus, became indebted to the Debtor in the amount of $11,100,000.00 as of October of 2019. As indicated, no promissory note was ever executed to reflect that indebtedness.

## II.    The First Rabbi Mayer Action and the Assignment of the CRDI Debt to CCI

6. On October 25, 2019, CRDI entered into a lease agreement with Chofetz Chaim Inc. ("CCI"), the sole member of Shem Olam, for CCI's lease of the Yeshiva Building located on the Kiryas Radin Property for a period of three years. A copy of the said lease is annexed hereto and labeled Exhibit "1". As can be seen therefrom, the lease required YCC to use the Yeshiva Building exclusively as a Yeshiva and community center at a rent of Seventeen Thousand Dollars per month. However, notwithstanding that CRDI had purchased the Kiryas Radin property and owned the same outright as of October of 2019, and notwithstanding that CCI was the sole occupant of the Yeshiva Building thereon, Rabbi Mayer refused to vacate the Yeshiva Building or the Kiryas Radin Property. Subsequent attempts to resolve the issues among ourselves (with the assistance of various local rabbis) proved unsuccessful.

7. On December 5, 2019, Rabbi Mayer brought an "emergency" motion to this Court (Judge Drain) seeking to hold my father in "contempt" for the purported "fraudulent" transfer of the Kiryas Radin Property to CRDI and to enjoin my father and me from taking any action with the respect to the Kiryas Radin Property. Subsequently, on January 15, 2020, Rabbi Mayer, purportedly derivatively on behalf of Mosdos, filed an amended complaint in a State Court action that he had commenced the prior year against the me, the Debtor and TBG Radin (seeking to set aside the assignment of the Assigned Mortgage from TBG Radin to the Debtor), which amended complaint sought, *inter alia*, to set aside the conveyance of the Kiryas Radin Property from Mosdos to CRDI and declare Mosdos to be the free and clear owner of the same.

8. Rabbi Mayer claimed in that action, *inter alia*, that he and his designees were the actual trustees of Mosdos and that they had not approved the sale. All the while, Rabbi Mayer and his family continued to occupy the Kiryas Radin Property, including the Yeshiva building that had been leased exclusively to CCI. CCI and CRDI removed that state court action to the District Court, which then referred the same to this Court.

9. Although Judge Drain ultimately denied the "contempt" motion, he set down the claims in that motion and the removed state court action for a trial. Although CCI and CRDI sought to use the Kiryas Radin Property for their purposes (in the case of CCI, that was to conduct services and classes in the Yeshiva) since CRDI's acquisition of the same, Rabbi Mayer's refusal to vacate the Kiryas Radin Property and, particularly, the Yeshiva, made it impossible for CCI to peaceably conduct prayer services and classes. Indeed, several public confrontations (many on videotape) took place as a result of the "dual" occupancy of the Yeshiva by CCI and Rabbi Mayer and his group.

10. On March 26, 2020, Judge Dain issued an Order delineating the disputed subject matters for the trial of the removed state court action (which included whether Rabbi Mayer's claim that his people were the trustees and in control of Mosdos, or my father's contrary claim, was correct) and also issued a "standstill order" which prevented CRDI and CCI from taking any action to remove Rabbi Mayer and his family from the CRDI Property or the Yeshiva. As a result, and given the discovery schedule and other pretrial matters, it appeared that the standstill order would remain in place for quite some time. Consequently, and given that CCI could not reasonably conduct its services, or provide a stable study atmosphere for its students, I began, in around early April of 2020, to look for an alternative location where it could do that.

11. One property which was adjacent to the Kiryas Radin Property, and had a single-family house located on it, was potentially a good fit, but CCI would have to purchase the property (it was not then being offered for sale), tear down the existing house, and build a Yeshiva and (potentially) student housing units thereon. I and other representatives of CCI commenced discussions with that adjacent property owner (who indicated a willingness to entertain discussions for a sale for approximately $1.75 to $2 million). However, CCI which, at the time, had as its sole asset only the lease to the Kiryas Radin Property, would have to obtain financing in order to acquire and develop the adjacent property.

12. When we started to investigate potential financing in around late May, early June of 2020, i discovered that no commercial lender was willing to lend the funds necessary to finance that project unless CCI had assets sufficient to support such a loan, which it did not. The Debtor, however, who owned the $11 million then-existing debt from CRDI, was in a position to assist its parent, CCI. To accomplish that, the Debtor could not simply "loan" CCI the CRDI debt (because a loan does not reflect as an "asset" on a balance sheet). Instead, on June 8, 2020, the Debtor

5

donated the CRDI debt to CCI outright, and so advised CRDI. While it was simply a book transfer, CCI owned the CRDI debt as of that date and the Debtor had no further rights to collect the same.[1]

### III. The Acquisition by the Debtor of the Highview Property and the Commencement of the Present Adversary Proceeding

13. Purported Movant YCC is a religious corporation of which Rabbi Aryeh is its President and Rabbi. YCC formerly owned the real property located at 82 Highview Road in Suffern, New York (the "Highview Property"). In 2007, the mortgagee on the Highview Property, TD Bank, N.A. ("TD Bank"), commenced an action against YCC seeking to foreclose TD Bank's mortgage on the Highview Property, which was then in default. In that foreclosure action, TD Bank was eventually awarded a judgment of foreclosure, and a foreclosure sale took place on August 20, 2013, in which TD Bank purchased the Highview Property. A copy of the recorded Referees' Deed conveying the Highview Property to TD Bank is annexed hereto and labeled Exhibit "3".

14. Four years later, on September 18, 2017, TD Bank sold the Highview Property to an entity known as Del Realty, LLC ("Del Realty") for $1,400,000.00. A copy of the recorded deed by which Del Realty acquired the Property is annexed hereto and labeled Exhibit "4".

15. Because substantial disputes had arisen between Rabbi Mayer Zaks ("Rabbi Mayer") and Rabbi Aryeh at that point related to the operations of Mosdos, My Father and I decided that we would attempt to acquire the Highview Property from Del Realty so that my father could, if he

---

[1] We were not able to reach an agreement with the adjacent property owner to complete that transaction and we then started looking for other properties. Ultimately, the issue of the ownership of the Kiryas Radin Property was tried on March 4, 2021 – one year after the standstill order was issued – and the Court (Judge Drain) ruled in favor of CRDI and CCI. That ruling was memorialized in a written Order on April 2, 2021. A copy of the same is annexed hereto and labeled Exhibit "??". As can be seen, the same stated that my father's identification of the actual trustees was correct, and Rabbi Mayer's false. Thus, the Court determined that the conveyance of the Kiryas Radin Property to CRDI would stand.

6

wished, either use the site for YCC or form his own congregation in the future independent of Rabbi Mayer and use the Property as the site of Rabbi Aryeh's yeshiva and (ultimately) student housing units.

16. My father and I formed 82 Highview on October 16, 2018, with the intention of acquiring the Highview Property in the name of that entity as soon thereafter as possible. I ultimately arranged for the transfer of the Highview Property by 82 Highview. In order to leave all options open (potential development, resale of the property, etc.), we did not form 82 Highview as a religious corporation, but rather it was formed under § 203 of the New York Limited Liability Company Law. That gave Rabbi Aryeh and me the greatest flexibility for the future use and/or disposition of the Highview Property with the least potential restrictions. A copy of the filing receipt and articles of organization for 82 Highview are annexed hereto and labeled Exhibit "5". A copy of a printout from the New York Secretary of State confirming the formation date and status of 82 Highview is annexed thereto and labeled Exhibit "6".

17. At the time of the formation of 82 Highview, Rabbi Aryeh was the sole forming/founding member/manager of that entity. A copy of the operating agreement of 82 Highview is annexed hereto and labeled Exhibit "7".[2] In that operating agreement, Rabbi Aryeh designated YCC as the

---

[2] As Rabbi Mayer Zaks neither founded 82 Highview nor was on the Board of Trustees of YCC at the time of the transfer of 82 Highview to Rabbi Aryeh Zaks, there was no need for Rabbi Mayer Zaks to either see the 82 Highview Operating Agreement or authorize it. Moreover, although Rabbi Mayer now contends that the Operating Agreement was "bogus," he has not presented what he claims to be the *actual* operating agreement of 82 Highview (contending, instead, that there never was *any* operating agreement of 82 Highview at any time). 82 Highview was formed on October 16, 2018, and the Operating Agreement was executed six days later, on October 22, 2018. If, as Rabbi Mayer now contends, he was in control of YCC (and YCC was in control of 82 Highview at that time), why hasn't he produced any operating agreement that he claims was controlling? Indeed, the only way that YCC could have possibly obtained *any* interest in 82 Highview was through such an operating agreement. If, as Rabbi Mayer now contends, the operating agreement of 82 Highview was "bogus," then YCC could not have *possibly* obtained (and therefore did not obtain) any interest in 82 Highview.

7

limited-duration member of 82 Highview "for the first thirty months of the LLC." That meant that YCC would be the sole member of 82 Highview LLC from October 16, 2018, through April 16, 2021, unless thereafter further extended by Rabbi Aryeh). The Operating Agreement further provided that:

18. Automatically upon the completion of said thirty-month term, all rights title (sic) and membership interests in the LLC shall belong to the Forming Member Manger or if so designated by the Forming member manager, to anyone else he so designates.

Upon the completion of the Thirty-month period above the percentage interest in the LLC that each member shall have is as follows:

| NAME & ADDRESS | CONTRIBUTION | %INTEREST IN LLC |
|---|---|---|
| (1) Rabbi Aryeh Zaks | NA | 100% |

19. The Highview Property was ultimately conveyed from Del Realty to 82 Highview on October 23, 2018, the week following our formation of 82 Highview. A copy of the recorded deed reflecting that transfer is annexed hereto and labeled Exhibit "8". Pursuant to the 82 Highview Operating Agreement, YCC remained the sole member of 82 Highview from October 16, 2018, until its term expired on April 17, 2021 (thirty months after the formation of 82 Highview), whereupon my father (having not extended YCC's membership) became the sole member of 82 Highview. Thus, as of April 17, 2021, the Property owned by 82 Highview was now owned by Rabbi Aryeh Zaks rather than YCC, as the right, title and membership interest in 82 Highview LLC was transferred to Rabbi Aryeh Zaks under the 82 Highview Operating Agreement.

20. On June 29, 2021 – more than *two months after* he became the sole member and manager of 82 Highview – Rabbi Aryeh Zaks caused the Highview Property to be transferred to the Debtor.[3] A copy of the deed (recorded June 20, 2021) conveying the Highview Property from 82 Highview to the Debtor is annexed hereto and labeled Exhibit "9".

21. The reason for the transfer (aside from my father's desire to disassociate himself from Rabbi Mayer) finds its genesis in the tax laws of the State of New York. My understanding was that an LLC would be entitled to a real property tax exemption if the LLC's sole member was a religious organization. I had been involved in cases in the past where the judge stated that to be the case.

22. Since 82 Highview was an LLC (i.e., neither a nonprofit nor a religious organization), the only manner in which I was aware the Highview Property could have maintained its tax-exempt status once YCC was no longer its sole member was if either its new sole member was a nonprofit or tax-exempt entity. Obviously, Rabbi Aryeh, as the sole member of 82 Highview as of that time, did not fall into that category. So, I and Rabbi Aryeh had one of two choices in order to maintain the property tax exemption on the Highview Property – either My Father could transfer his membership in 82 Highview outright to a religious corporation, or 82 Highview could transfer the Highview Property to another entity which had, as its sole member, a religious entity.

23. My father decided to convey the property to the Debtor, because the Debtor's sole member (Chofetz Chaim, Inc.) was a religious entity which would (insofar as we thought at the time) permit

---

[3] Even were it not that Rabbi Aryeh became the sole member of 82 Highview LLC at that point, the Operating Agreement still gave him the exclusive right to manage the LLC. Section II(3) of the Operating Agreement provided that "[t]his LLC shall be managed exclusively by its forming member manager."

9

the Highview Property to retain its property tax exempt status.[4] Rabbi Aryeh and I would also have a say in the management of the Debtor because Chofetz Chaim Inc. (its sole member) was controlled by its Board of Trustees which was comprised of my father, me, and other members of our family and as My Father was the manager of the Debtor.

24. On December 23, 2021 – almost *eight months* after YCC was no longer a member of 82 Highview, and almost *six months* after the acquisition of the Highview Property by the Debtor – , Rabbi Mayer (purportedly on behalf of YCC and 82 Highview) commenced yet another action in the New York State Court, Rockland County, under Index No. 36879/2021 (the "State Court Action") seeking to set aside the conveyance of the Highview Property from 82 Highview to the Debtor.

25. On the date that that action was filed, however, we believed that the Debtor had only one creditor, one of its prior attorneys, who was owed slightly more than $100,000.00, and who was not pressing for quick payment. If push came to shove, the Debtor could have borrowed the funds necessary to pay him from a private lender. Thus, there was no immediate necessity for any Bankruptcy Court intervention, and we were not even thinking in those terms. Instead, we retained counsel who, on February 15, 2022, moved to dismiss Rabbi Mayer's complaint on the ground that documentary evidence existed (Shem Olam's Operating Agreement) which we believed constitutes a complete defense to the action.

---

[4] Although not relevant to the instant motion, there were other important prevailing business and financial considerations which also mitigated in favor of the Debtor acquiring the Highview Property. While too detailed and complex to discuss in depth here, one example of the same was the payment by the Debtor, from the proceeds it received for the satisfaction of the Assigned Mortgage, to various creditors of YCC, including a payment of $5,302,750.00 to Arnav Industries Inc., which held a mortgage on the Highview Property.

10

26. On April 15, 2022, Rabbi Mayer moved for a temporary restraining order and preliminary injunction prohibiting the Debtor (or me or my father) from selling the Highview Property or commencing any eviction proceedings with respect thereto. On the same day, April 15, 2022, Judge Berliner denied Rabbi Mayer's request for a temporary restraining order.

27. Although the motion to dismiss was made on February 15, 2022, and the order to show cause seeking a preliminary injunction was filed on April 15, 2022, the state court judge (Judge Berliner) did not issue a decision until July 12, 2022, some three months later. In that decision, Judge Berliner denied the motion to dismiss, ruling that issues of fact precluded the same at that point, but he did not issue any preliminary injunctive relief.

**IV.    The Property Tax Abatement Application**

28. In the meantime, on February 23, 2022, the Debtor filed a request for a property tax exemption that the Highview Property had been granted the prior year. I filed the same as the property manager of the Highview Property.[5] A copy of the same is annexed hereto and labeled Exhibit "10".

29. On April 29, 2022, the Town of Ramapo tax department sent the Debtor a letter denying the application for property tax exemption for 2022. A copy of the same is annexed hereto and labeled Exhibit "11". Also on April 29, 2022, the Town of Ramapo notified the Debtor that the prior 2021 exemption was being retroactively reversed as well. A copy of that notice is annexed hereto and labeled Exhibit "12". Thus, in the blink of an eye, Shem Olam went from having a single (friendly) creditor to a claimed tax obligation of nearly $600,000.00.

---

[5] The designation on the application was that I was the "manager," however I intended and understood that to mean that I was the property manager for the Highview Property.

11

30. The Debtor sought review of the same from the Town of Ramapo Assessment Board of Review, which, on June 29, 2022, refused to reverse the determination. A copy of that determination is annexed hereto and labeled Exhibit "13". On July 27, 2022, the Debtor filed a petition in the state court for certiorari, challenging the determinations of the Town of Ramapo Tax Department, under Index number 33289/2022. However, If the town of Ramapo was successful in opposing that petition, a large monetary judgment would have been entered against the Debtor and the Debtor would have had absolutely no means by which it could pay the same, because, in the short term, notices of pendency had been filed against the Highview Property by Rabbi Mayer, and, in the long term, the Debtor faced being divested of its sole asset, the Highview Property. If the attack on the Highview Property did not exist, the Debtor could have either financed the same to pay any tax and attorney's fee obligations, or sold the same to accomplish that purpose. Thus, the fate of the Highview Property was directly linked to the Debtor's ability to pay its creditors.

31. Moreover, aside from its former attorney to whom the Debtor then owed money, it had also accumulated additional legal fees for its counsel's efforts in the state court action that Rabbi Mayer had commenced seeking to set aside the Highview Property transfer. It could not pay that either unless it was able to finance or sell the Highview Property.

32. Based on all of that, the petition was prepared and filed within one week of the summary judgment motion being filed by the Town of Ramapo.

I affirm under the penalty of perjury that the foregoing is true and correct.

_____

Affirmed: September 5, 2022